**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **JAZZALYNN McMURRIN,** | § | Cause No. _____ |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Hon. _____, Judge |
| | § | |
| **M. D. ANDERSON SERVICES** | § | |
| **CORPORATION d/b/a M D** | § | |
| **ANDERSON CANCER CENTER,** | § | |
| **Defendant** | § | Hon. _____, Magistrate |

**PLAINTIFF'S ORIGINAL COMPLIANT
FOR UNLAWFUL EMPLOYMENT DISCRIMINATION
AND DEMAND FOR JURY TRIAL**

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Ms. Jazzalynn McMurrin, hereinafter called Plaintiff, by and through the

undersigned counsel, Robert Teir, PLLC, complaining of and about M.D. Anderson Services

Corporation D/B/A M D Anderson Cancer Center ("M.D. Anderson"), hereinafter called

Defendant, and for causes of action respectfully alleges and shows the honorable Court the

following:

**I.      NATURE OF THE CLAIMS**

1.      This is an action for monetary damages, to redress Defendants' unlawful employment practices

        regarding the Plaintiff, including Defendants' unlawful discrimination, harassment, and

retaliation against Plaintiff because of her race/color, in violation of §1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") (for the race discrimination and retaliation claims); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title [*2] VII") (for the race discrimination and retaliation claims); as well as Chapter 21 of the Texas Labor Code, §21.001 et. seq., Texas Labor Code, as amended.

2.     The Plaintiff is an experienced and educated nurse, who is currently employed by Defendant M.D. Anderson.

3.     Defendant M.D. Anderson is part of the state-funded University of Texas System.

4.     When Plaintiff McMurrin was assigned to M.D. Anderson's Outpatient Clinic at its Galveston, Texas hospital, she was the sole African American employee in that department.

5.     At that time, Ms. Murrin got along well with her supervisor and boss, Ms. Tanya Jinkersen.

6.     In February of 2020, Ms. Jinkerson left her position with M.D. Anderson.  With the manager position vacant and the nominal leader of the department inattentive to the department's working environment and frequently uninformed, things got worse for the Plaintiff.

7.     Things quickly changed for Ms. McMurrin after that.  Shortly after her initial supervisor left, Ms. McMurrin was made to feel, and did feel, that she was separate, different, and less valued, by her fellow employees and by management.

8.     One of the most important manifestations of this change of environment was when Plaintiff received her first formal admonishment ('write-up').  The write-up was initiated by a fellow nurse whom Plaintiff had known for over twenty years and who, in these two decades, not once had a critical word to say about Plaintiff's work, team spirit, or professionalism.

9.      The initial write-up was followed by others.  Other nurses received no such criticism or treatment for similar conduct or statements.   Ms. McMurrin began to feel 'singled-out' and began to feel that the reason was that she was the only Black employee in the Unit.

10.     Sensing a deteriorating and hostile working environment, but believing that the situation could be addressed and corrected, Ms. McMurrin shared her concerns about being singled-out as the sole Black employee in her unit and the differing treatment.  Her internal reporting included telling of the multiple false accusations, featuring accusation of engaging in conduct that she never engaged in, as well as instances where she was not treated as a respected and equal member of the nursing staff.  She described feeling that she was the sole member of the second-class citizens when she went to work.

11.     Plaintiff's hopes for a review of her complaints and an improving work environment were not fulfilled.   Management not only ignored her concerns, it also ignored three members of the teaching faculty who approached them on Plaintiff's behalf to talk about the discrimination and mistreatment she was facing.

12.     Like at workplaces around the country, and around the world, things became uncertain, confusing, and worrisome in Ms. Murrin's M.D. Anderson unit in March of 2020, when COVID-19 becoming a serious and dangerous threat to nearly everyone.[1]

---

[1] The first case of Covid-19 in the Houston area was diagnosed on March 3, 2020.  On March 6, 2020, Mayor Steve Adler of Austin cancelled the internationally popular SXSW (South by Southwest festival).  On March 11, Mayor Sylvester Turner declared a citywide emergency and the Houston Rodeo, the state's biggest annual event, was cancelled.  That same evening, the National Basketball Association suspended all games, and President Trump banned incoming flights from Europe.  On March 12th, Major League baseball and NCAA basketball joined the NBA in suspending play.  On March 13th, the University of Texas' main campus in Austin shut down, following the decision of Rice University to do so.   In Washington, President Trump declared a national emergency.  March 15th brought Texas' first Covid death.  On March 24, 2020, Harris County, the State's largest county, issued a stay-at-home Order.  By

13.     Your Plaintiff was on a pre-planned time-off/vacation when places were closing and precautions like masks and social distancing were mandated.  Upon returning to work, Ms. Murrin was verbally attacked by another nurse, who decided unilaterally that Ms. McMurrin's absence was both wrongful and disloyal.  An Assistant Nurse Manager terminated this hurtful and discriminatory discussion, saying: "this is an inappropriate communication and has to stop."

14.     Later, on or about April 9, 2020, Plaintiff was summoned to her manager's office.  In addition to my manager, Associate Director Leon McGrew was there.  Once there, she was accused of 'rolling her eyes' when a physician asked for her assistance. McMurrin was told that the 'eye rolling' was going to be the subject of yet another write-up, and that management also accused her of making "inappropriate communications" to staff members via text messaging.  Neither the eye rolling accusation, the lack of helpfulness accusation, or the inappropriate communications accusation had any truth to them.  Indeed when Ms. McMurrin asked when these things occurred, she was told that they occurred on a week when she did not step foot on a M.D. Anderson campus.  It was clear to her that accusations were being invented to make her look like a bad, uncooperative, and obstinate employee.  McMurrin concluded that many people in her department, including management, wanted her to be gone, as, then, they could enjoy an ethnically pure department.

---

March 26th, the United States had more Covid cases than any other country in the world.  On March 29th, Gov. Abbott required all visitors from, and all people coming, from Louisiana to quarantine upon entering the State.

15.     At that time, Plaintiff's Assistant Manager ceased talking to her, including about work matters and duties.  With this 'silent treatment,' Plaintiff found herself in the surreal position of being ignored by her Assistant Manager, as if she was not there or invisible.

16.     In what seemed an obvious retaliation to punish her for racing issues of race discrimination, management assignedf her to a far less desired position, in the Defendant's Injections Unit, for two days in succession.  The Injection Clinic was often tedious work, that neither Plaintiff nor her colleagues welcomed or looked forward to doing it.  No employee was asked to work there for two days in a row, except McMurrin, the employee who was complaining about race discrimination.  Similarly, an assignment at the Injection Clinic was supposed to be followed by two weeks without returning there.  That was the case, except for Ms. McMurrin.

17.     On or about On or about May 13, 2021, Ms. McMurrin was summoned to the Director's office.  Immediately after she was seated, he said to her: "Can you do me a favor – quit playing with these white folks."  The Director advised her to "watch your step."

18.     When a new manager for her unit was hired, things went from bad to worse for the Plaintiff.  One time, all nurses except her were invited to the manager's office for a chat or meeting.  The Plaintiff thought that the absence of so many nurses from the patient floors presented a danger, and went to the nurse's office to say this.  The result was yet another write-up, this time with the Plaintiff accused of using "inappropriate" language, displaying "hostile body language," and using profanity.

19.     Next, the Plaintiff's workstation was moved to a new location, without any advance notice, including Plaintiff's personal belongings.  As if this was not sufficiently demeaning, the Plaintiff's desk photographs were put into a trash bin.

20.     About that time, the bottom fell out and the racist attitudes, and racist talk, became explicit, and nearly constant.  To diminish or eliminate comments about Black people's make-up, Plaintiff ceased wearing cosmetic eyelashes.  It did not help.  It only changed the object of people's spoken derision from eyebrows to other body parts and features, including the thickness of Plaintiff's lips.

21.     Around that time, a co-worker who used lip fillers shared her view that "Jazz {the Plaintiff} don't have to buy lips, ass, or suntan"

22.     Not once has any such discussion happened about the appearance, or body parts, of a white employee (or an Asian/Pacific Islander or Hispanic or employee).

23.     Plaintiff's administrative grievances resulted in no changes and were usually ignored. What had become clear to Ms. McMurrin was that she was the 'invisible' employee, not seen as an equal, not seen as respected, not seen as valuable, and that she was an employee whose input is not valued, and perhaps never would be.

24.     To help her cope, Plaintiff sought professional help and now takes prescribed anti-depression medication.  The medicine does help, but her awful working situation and environment has resulted in the Plaintiff wrestling with depression, anxiety, and mental anguish, including psychosomatic headaches and other ailments.

## II.     JURISDICTION AND VENUE

25.  The honorable Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions arising from statutes adopted by Congress and signed into law by the President of the United States regarding the deprivation of Plaintiff's civil rights under Title VII, Section 1981.

26.  The honorable Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367(a).

27.  The honorable Court has personal jurisdiction over the entity Defendant, because this Defendant is a Texas-based business, with its history, operations, and employees all, or nearly all, in the State of Texas.

28.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this federal district.

III.   **PARTIES AND SERVICE**

29.  Plaintiff, Ms. Jazzalynn McMurrin, is an individual whose address has the delightfully Texan name of 9502 Yellow Rose Drive, Texas City, Galveston County, Texas [77591-1432].

30.  The last three numbers of Ms. McMurrin's (Texas) driver's license number are 010. The last three numbers of her social security number are 775.

31.  Defendant M.D. Anderson Cancer Services Corporation, also known as M D Anderson Cancer Center, is an educational institution and hospital within the

University of Texas system.  The M.D. Anderson hospital where Plaintiff is employed is located at 301 University Boulevard, in Galveston, Texas [77555-5302]. Its switchboard telephone number is 409.772.1011.[2]

32.   Defendant is organized under the laws of the State of Texas and service of process upon Defendant may be affected pursuant to Rule 4 of the Federal Rules of Civil Procedure.  Service of said Defendant as described above can be affected by personal delivery upon its registered agent for service of process registered with the honorable Texas Secretary of State, to wit CT Corporation, located at 1999 Bryan, Suite 900, in Dallas, Dallas County, Texas [75201-3140], and by direct communication with the Defendant's usual legal counsel, the office of the Attorney General of Texas.

33.   Defendant M.D. Anderson has a duty to avoid unnecessary expenses in serving such a summons. The Plaintiff, through counsel, shall notify Defendant, through its usual counsel, that this action has been commenced in this honorable Court and request that it waive formal service of a summons.

## IV.   CONDITIONS PRECEDENT

34.   This suit is brought within ninety days of the Plaintiff's receipt of the 'right to sue' letter from the United States Equal Employment Opportunity Commission.

35.   The EEOC filing was timely.

---

[2] According to the online encyclopedia Wikipedia, MDACC employees approximately 11,000 people *See* WIKIPEDIA "University of Texas Medical Branch," at https://en.wikipedia.org/wiki/University_of_Texas_Medical_Branch.

36.   All conditions precedent to the institution of this lawsuit have been fulfilled.


## V.   FACTS

A.   The Beginning of a Pattern of Discrimination

37.   Your Plaintiff a professional nurse.  While a relatively quiet person, probably more introverted than gregarious, she is, for colleagues, supervisors, and patients, both approachable and eager to be helpful.  Her dedication to being helpful to others is why Plaintiff became a nurse.

38.   Plaintiff McMurrin interviewed for employment at M.D. Anderson on or around July 6, 2018.  Mr. Leon McGrew conducted the interview on behalf of MDACC.  The interview seemed normal and went well.

39.   A short while after this interview, Plaintiff received an offer of employment letter. She began working at M.D. Anderson on or about August 6, 2018.  Her initial assignment with the Defendant was as a Clinical Nurse for Inpatient Care.

40.   On or about February 18, 2021, she transferred to work at the Outpatient Clinic, which was under the management of Ms. Tanya Jinkersen.

41.   When Ms. McMurrin joined the outpatient clinic, she was the only African American nurse in the Department.  Initially, this had no effect on her employment, her daily tasks, routines, or her assignments or relationship with her co-workers.

42.   At the time, Plaintiff felt a comradery with Ms. Jinkersen, her supervisor, and boss.

43.   During the time Plaintiff worked under Ms. Jinkersen's supervision, she received no questions, complaints, or concerns about how she communicated with her colleagues, or about her dress, appearance, voice, or word choices.

44.     Ms. Jinkersen left her position with M.D. Anderson in February of 2020.  Since this colleague's departure, Plaintiff has experienced a one-way downward path.  Before long, Plaintiff realized that she was not only treated worse, she was also treated differently, and worse, than the White and other non-Black employees.

45.     The discrimination wore down Plaintiff McMurrin's spirits, her energy level, and her gentle confidence.

46.     One of the worst blows to Plaintiff's self-esteem and emotional health was the ever reducing, and soon disappearing, loss of trust from her co-workers.  This diminishing trust occurred and continued notwithstanding her consistent efforts to treat all her colleagues in a professional and friendly manner.

47.     An example of the changed environment and the changed way Ms. Murrin was treated at work was that she received her first formal admonishment, referred to on the Defendant's campuses as a 'write up.'  One write-up soon became a few write-ups.

48.     Yet, Jazzalynn McMurrin's nursing work remained, as it had been for years, not just satisfactory, but exemplary.  She could be counted upon as a team-player, a cooperative colleague, and someone who could be counted on to be helpful with any reasonable request that fell within the scope of my employment.

49.     Plaintiff expressed her concerns about being singled-out as the sole Black employee in her unit and the differing treatment.  She professionally explained that she was mistreated and was the object of false accusations about conduct that she never engaged in, and the ever-increasing number of times where she was not given respect as a colleague and a nursing professional.  She also shared her conclusion that the

department had singled out its one African American nurse to be the one, and only, second-class citizen of the unit.

50.     The expression of her concerns led to nothing and was usually not even greeted with reply.  Management at M.D. Anderson not only ignored the Plaintiff's concerns, they also ignored three members of the teaching faculty who approached them on my behalf to talk about the discrimination and mistreatment Plaintiff was facing.

51.     Subsequently, Plaintiff learned that a M.D. Nurse Educator approached yet higher management to speak up on Plaintiff's behalf.  The words of others, like her own, did not result in any beneficial actions or changes.


B.     Onset of the COVID Pandemic

52.     Like at workplaces around the country and around the world, things became uncertain, confusing, and worrisome in Ms. McMurrin's department, and M.D. Anderson generally, in March of 2020 when COVID-19 becoming a serious and dangerous threat to nearly everyone.[3]

---

[3] The first case of Covid-19 in the Houston area was diagnosed on March 3, 2020.  On March 11, Mayor Sylvester Turner of Houston declared a citywide emergency and the Houston Rodeo, the state's biggest annual event, was cancelled.  That same evening, the National Basketball Association suspended all games, and President Trump banned incoming flights from Europe.  On March 12th, Major League baseball and NCAA basketball joined the NBA in suspending play.  On March 13th, the University of Texas' main campus in Austin shut down, following the decision of Rice University to do so.  In Washington, President Trump declared a national emergency.  On March 24, 2020, Harris County, the State's largest county, issued a stay-at-home Order.  On March 29th, Gov. Abbott required all people coming from Louisiana to quarantine upon entering the State.  By March 26th, the United States had more Covid cases than any other country in the world.

53.    Plaintiff McMurrin was on vacation leave, and on a holiday planned months

beforehand, when the new virus went from worrisome to alarming.  She returned

from vacation leave on or about March 23, 2020.  Even while away from work, she

tried to stay in touch and learn what she could about the adaptations being made and

how M.D. Anderson was changing to keep its staff and its patients safe.

54.    When Ms. McMurrin returned to work, she was verbally attacked by another (white)

nurse, who declared that it was wrongful and disloyal to be out of work in the crisis.

This nurse even insinuated that she had access to, and read, Ms. McMurrin's medical

records.  While nothing this nurse said to the Plaintiff has any basis in fact, it was still

demeaning and rude to express the accusations in the form of a temper tantrum.  Yet,

some of those in hearing distance appeared to see these mean-spirited comments as

somehow funny.

55.    Plaintiff responded to the attack by pointing out that there was nothing funny about

anyone contracting this virus, which frequently caused a loss of the ability to breathe

normally.  She added that her absence did not present a threat to the health of her co-

workers, but her co-workers' penchant for sneezing, coughing, and spitting in the

hospital's trash bins did so.

56.    An Assistant Nurse Manager entered and terminated the discussion, saying: "this is

an inappropriate communication and has to stop."

57.    On or about April 9, 2020, McMurrin was summoned to her manager's office.  In

addition to the manager, Associate Director Leon McGrew was present.  Once there,

McMurrin was accused of 'rolling her eyes' at a physician when the doctor asked for

her assistance walking a patient out of the facility.  She was told that the alleged eye-

rolling was going to the subject of a write-up, to be joined by the accusation that she made "inappropriate communications" to staff via text messaging.

58.     Plaintiff listened respectfully, but lacked any understanding of what the manager was talking about.   Plaintiff was not aware of any inappropriate communications, via text messaging or otherwise.  She was equally unaware of any inappropriate reaction to any physician's request for my assistance.

59.     Plaintiff asked when these things allegedly happened, and was told, vaguely, that they occurred in the last week of March.  Because Plaintiff was on leave for a portion of that week, she was not on any M.D. Anderson campus when the alleged 'eye rolling' occurred.  Plaintiff was never shown what it was that she had allegedly sent by text messaging.

60.     The factual rebuttal, which should have shown that the accusations against Plaintiff could not have been true,  was ignored.  The threatened write-up was completed, with the accusation of poor on-campus conduct even when she was not on campus at the time of the alleged improper conduct.  In the write-up, Plaintiff was advised to take a course in 'professionalism,' which is normally offered on the Main Campus (in Galveston), notwithstanding the (then) facility-wide directive that all in-person instruction was suspended due to the COVID virus.

61.     No such directive (to take an in-person course) was given to any non-African American employee in this frightening and uncertain time.  Because of the discrimination, Plaintiff informed Mr. McGrew, the Director, that she was being treated harshly, unequally, and unfairly and that she wanted to file a grievance.

62.    At this time, Ms. McMurrin's unit still had the manager position vacant.  She therefore requested to speak with the person who was the nominal leader of the department.  Plaintiff explained to her what was going on and set forth the increasingly differing treatment than white employees in the brief time allotted her.  She never received anything resembling a reply, yet alone corrective action.

63.    Things only became rougher and sourer.  Feeling that she was running out of options, McMurrin wrote her Director and asked to speak with him.

64.    She did not get a reply from my Director.  Instead, Mr. McGrew came to speak with Ms. McMurrin and said that he wanted to meet with her and another nurse to "find out what the hell is going on."  He did meet with the two nurses and Plaintiff once again expressed her concerns about her ever-declining treatment at work.

65.    Apparently in response, Ms. McMurrin's Assistant Manager ceased to communicate with her.  With this bizarre 'silent treatment,' Plaintiff was in the unenviable surreal position of having her Assistant Manager ignoring her as if she were not there or was invisible.


C.    <u>From Christmas Season, 2020</u>

66.    On or about December 21, 2020, Ms. McMurrin received an email from her Assistant Manager, asking if she completed the professionalism course that she was asked to take.  This message came against the backdrop of this Assistant Manager's almost complete silence/refusal to communicate with McMurrin.

67.    Ms. McMurrin reported that she had not taken the course.  She explained that she did not do so because, on the day after this request was made, she filed an internal

grievance, where she stated that the referral to professionalism training arose from stereotypes and hostility to her relatively formal manner of speaking and her relatively deep voice.

68. That grievance went nowhere.  The Plaintiff never received a response to it.  From all appearances, it led to no investigation, review, or thought.

69. In January 2021, Ms. McMurrin was assigned to work the Defendant's Injection Clinic for two successive days.

70. The Injection Clinic was often tedious work, which neither Plaintiff now her colleagues welcomed.  Because it was disfavored work, there was a routine practice not to assign a nurse to the clinic for two days in a row.  Indeed, to Plaintiff's knowledge, no one was ever assigned to work there for two days in a row since she began working at M.D. Anderson.  She felt that she was being punished for expressing concerns about discrimination and that the assignment was yet another example of being treated worse than her white colleagues.

71. Another response to the dislike of Injection Clinic work was no employee was supposed to return to the clinic until at least six weeks had passed since the last assignment there.  Yet, after only ten days since such an assignment, Plaintiff was rejected to return to the clinic.  She asked her manager why this disparate treatment was happening, eliciting the response that there were employees out, and that McMurrin had agreed to cover another nurse's absence.  McMurrin had agreed to cover that nurse's tasks, but, when she was sent back to the Injection Clinic, that nurse was at the facility and was working.  This made the response pure nonsense.

72.     Plaintiff was sternly told by the manager that the manager was not going to make that nurse "make-up the lost day at the Clinic," because she does not do such a thing. McMurrin responded that she did do such a thing; and that she had expressly told me that it was correct to have two consecutive days there because I had previously missed a day.  Nevertheless, McMurrin went to work at the Injection Clinic.

73.     Plaintiff again contacted her Director, telling of harassment and retaliation for raising prior instances of harassment.  The Director invited Plaintiff to talk with him about this in person.  When they met, the Director said that he wanted a nurse from her department to be brought into the discussion to try to "resolve all issues."  That nurse showed up at the Director's office, but remained standing, in the doorway. Additionally, even though the nurses were addressing higher management, the nurse had a smirk-like smile on her face the entire time she was there.

74.     The group discussed the nurse's lack of communication with the Plaintiff.  McMurrin noted that her lack of communication was noticed by others, and that the lesson she may be imparting is that employees who raise any concerns, no matter how legitimate, would find themselves getting 'the silent treatment.'  The nurse resisted this explanation, saying instead that she had ceased trying to communicate with McMurrin because she felt that "I can't approach you because of your tone."  She added that the way that McMurrin speaks is "inappropriate."

75.     Plaintiff asked the nurse for examples of 'inappropriate' communications.  Instead of providing any examples, the nurse said, vaguely, that, when she asked me to speak with her about 'doctor concerns,' I became "defensive," and adopted a "tone" that was "unwarranted."

76.  Plaintiff does speak with what some may identify as a certain masculinity in her voice, perhaps because it is a tad deeper than most female voices.  Plaintiff patiently and engagingly explained that she had that bass-level voice since she was a child.  Plaintiff left the three-way meeting believing that progress had been made.  Plaintiff thanked the nurse and the Director and returned to her duties.

77.  While, afterwards, that nurse did become a bit more courteous to Ms. McMurrin, there was still a coldness and a distance whenever the nurse addressed her.  If this nurse came into an office with McMurrin and other health care professionals, or approached a group that included McMurrin, the nurse would only speak to the white people there (that is, people who were not Black), but not to the Plaintiff.

78.  While working at the Injection Clinic, Plaintiff came across a patient scheduled to receive an injection of Goserelin.[4]  Plaintiff McMurrin had not been trained to give such an injection to a patient.   Concerned about the safety of the patient in light of her lack of training, Plaintiff asked another nurse to provide the mediation.

79.  On or about May 13, 2021, the Plaintiff was summoned to the Director's office.  Immediately after she sat down, the Director bluntly said: "Can you do me a favor – quit playing with these white folks."

_____

[4] Goserelin is an injected medicine that suppresses the production of gender-specific hormones.  It is used to treat hormone-sensitive cancers, such as breast and prostate cancer, as well as some gynecological disorders.  It is also sometimes used to treat precocious puberty.  It is administered solely through a subcutaneous injection.

80.    Such an explicit reference to race in the workplace, and an instruction to act differently to the majority group, was unheard of and left Ms. McMurrin stunned.

81.    The Director told Plaintiff that the nurse with whom she previously met in his office had written her up for wrongful practices, specifically for her request that some other person administer Goserelin to a patient.

82.    Ms. Murrin was horrified.  She explained that she had never administered an injection of this medicine before.  She also explained that I had said nothing to that nurse about what had occurred at the Injection Clinic.  She said that if a nurse had reported for saying something that that was inappropriate, it had to be a bold face lie.  Indeed, it could not have been true because that nurse had shut down all communications between the two of them.

83.    The Director advised the Plaintiff to "watch your step."  Plaintiff had the feeling that she was being cautioned that her colleagues may pretend to be friendly but were, still, out to get rid of her.

D.    <u>New Management: The Spring of 2021</u>

84.    A new manager was appointed on or around March 18, 2021.

85.    On or about June 8, 2021, the Plaintiff was multi-tasking with patient education, acute injection treatments, and a chemo-therapy injection.  A Registered Nurse pulled the medical assistant from the floor for a meeting, leaving Plaintiff with solo responsibility for the patients and tasks the two of them had been tackling together. While doing her best to keep up, including with data entry on the computer, Plaintiff could hear the steady giggling from the room where this 'meeting' was occurring.

86.     Concerned that she was being asked to handle too many situations and too many

patients, and frightened about the potential repercussions for patients' wellbeing and

safety, Plaintiff went to the room where the gathering was occurring and knocked on

the door.  She saw that only white employees had gathered there.  Plaintiff said that

help was needed on the patient floor, for some time, adding that it seemed

incongruous to host a meeting in the middle of a particularly busy day.

87.     The very next day, Plaintiff learned that her concern about patient welfare resulted in

yet another write-up.  This time, Plaintiff was accused of entering a staff meeting and

using "inappropriate" language, that she displayed "hostile body language," and that

she had used profanity.   The alleged profanity use was, 'what is so special about a

damn meeting?'

88.     While people may disagree whether the use of 'damn,' after the 1939 release of

'Gone With the Wind,' qualifies as profanity, the Plaintiff had said no such thing.

Moreover, your Plaintiff knows how to use colorful language when she feels it is

needed.  If there was a need to use profanity at work, the offensive words from her

mouth would most certainly not be 'damn.'

89.     Once again wrongly accused, and feeling even more frustrated because it was

happening yet again, Ms. McMurrin went to the nurse who prepared the write-up and

asked her for a chance to discuss the new accusations.

90.     Ms. McMurrin began by saying that she was a person who values and practices

politeness, and therefore knocked on the meeting door and did not burst-in upon

anyone.  She explained the concerns she had about being short staffed on the patient

floor. She summarized by saying that the write-up was not quite exaggerated; it was simply untrue.

91. This nurse replied that "we" had coached me about professionalism on a prior occasion. She added that, when McMurrin was previously written-up, Mr. McGrew had "dropped the ball on that" so there was no further disciplinary action at that time, and that the hospital had "just let it go."

92. For what seemed like the hundredth time, McMurrin patiently replied that she could not do anything about the relatively deep tone of my voice. She added that, whether her vocal range had a low C or a high F, it should not matter in the workplace. In any case, she explained, she could not help the voice that God and nature had given her.

93. In response, McMurrin was told that she can control these things, and that was why she was being sent to a professionalism class. Once again, McMurrin had the feeling that I was speaking in a language no one understood, or that the person to whom I was speaking had turned momentarily deaf. She stated that she was not being heard and that she intended to file a grievance.

94. After this dialogue, McMurrin approached three of the five people who were in the room when she knocked at the meeting door. All three told her that they heard no curse word, from McMurrin or from anyone else. Yet, the write-up stayed.

95. Facing the write-up, Ms. McMurrin told her manager that she was going to the hospital's Human Resources Department to talk to them about what had grown into an incessant pattern of discrimination and a racially antagonistic working environment.

96.     Before Plaintiff had the chance to speak with anyone in HR, the Director asked to speak with McMurrin on June 10, 2021.  There, the Director asked her to remember their previous conversation, where he had told her to look out for herself.  She replied that she had been trying to do just that, that she did not do anything wrong, that she did not pick fights or disagreements, and that she wanted nothing more than the drama and the baseless criticism to stop.  The Director only said that he would investigate and promised to get back to me.

97.     Later that same day, Plaintiff's workstation was moved to a new location, without any advance notice to her, including moving her personal belongings.  As if this was not sufficiently demeaning, the people who moved her things placed her photographs in a nearby trash bin.

98.     Later, Plaintiff was asked to return to my manager's office.   There, I was told that the Director had completed his investigation.  The manager said that, as a result of that investigation, "we" decided to remove the reference to profanity in the write-up.

99.     This very partial and entirely unsatisfactory acknowledge that the profanity allegation had to be withdrawn because it lacked any factual basis, yet the write-up containing other false averment was not withdrawn.  The obvious lesson, to anyone paying attention, is that white people could feel free to lie about disliked employees, because something will eventually stick if you make enough false accusations.

100.    Ms. McMurrin proceeded to request an Executive Review of her grievance, as she had not received any response to her grievances or her request for an Executive Review.  Meanwhile, her manager's 'silent treatment' continued.

101.    To make an unusually uncomfortable work situation even more uncomfortable, Ms.
        McMurrin became the object of an increased flow of highly intrusive, busybody
        inquiries and bizarre requests, including being asked to remove my wig, and
        including questions such as, "how long is your real hair?"  McMurrin also continued
        to receive negative and hostile comments about her make-up.

102.    To the Plaintiff's knowledge, no white nurse ever was the object of such questions.
        In an attempt to reduce some of this hostility and personal insults, Plaintiff ceased
        wearing cosmetic eyelashes.

103.    By this time, out of fear people that her white colleagues would pretend they hear
        hostility from her, McMurrin adopted a practice not to speak unless a question is
        addressed to her.

104.    It did not help.  Things got worse, and even more racially charged.  For example, the
        other employees surrounding the Plaintiff set out to make the subject of the size of
        Ms. McMurrin's lips the topic of frequent conversation, with one saying with a sigh
        that she guessed that McMurrin was stuck with the lips she had.  The obvious,
        spoken-allowed reference to the trope and stereotype of black folks with puffy lips
        was painful and demoralizing.

105.    When a co-worker received lip fillers, that worker said, referring to herself, "Stan said
        you look like a white Jazz."  Later, the same co-worker went on to report that another
        said to her that "Jazz {the Plaintiff} don't have to buy lips, ass, or suntan."

106.    Not once has any such discussion happened about the appearance, or body parts, of a
        white employee (or an Asian/Pacific Islander or Hispanic or employee).  It would be
        equally offensive for the floor conversation to be about the length of Jewish

employees' noses, or whether our Moslem colleagues started the day by flying a plane into a skyscraper.  But, when it came to Jazzalynn McMurrin, and Black people, all expectations of decorum go out the window, and it is open season.

107.    All these occurrences have left the Plaintiff in a functional no-person's land, singled out as the only Black employee in the unit, with multiple write-ups, afraid to wear even the most basic make-up, or to say so much as a 'good morning' to her colleagues, and where she is the only employee seemingly sentenced to a perpetual silent treatment.  No white person at MDACC has such burdens and stress imposed upon them.

108.    Meanwhile, in the face of Ms. McMurrin's administrative grievances, there has been no response and no corrective action.  For the Plaintiff, this meant that her employer decided she can be treated as if she were invisible, to be neither seen nor heard, where she need not be addressed, or treated, like a professional, co-employee, or human being.

109.    The daily put-downs and discriminatory treatment have led to severe challenges with anxiety, depression, and self-esteem.  The Plaintiff sought professional help and is now taking prescribed anti-depression medication.

110.    The Plaintiff has found that the prescribed medication helps, a little bit.  She believes, very strongly, that what would help more is for people would apply the same speech filters and conduct rules that they routinely do for their white colleagues.  What would help even more is if Defendant M.D. Anderson becomes committed to actually heeding the equal employment opportunity and diversity goals that it crows about on

its website.  Then, not only could her employment be made pleasant and professional,

but the State of Texas could also stop paying discrimination plaintiffs, collectively,

millions of dollars a year in damages.

111.    M.D. Anderson, on its website, advertises itself as an institution that "strives to

maintain an environment free from discrimination against individuals on the basis of

race, color, national origin, sex, age, religion, disability, sexual orientation, gender

identity, genetic information, or veteran status."[5]

112.    On or about August 29, 2018, the United States Equal Employment Opportunity

Commission issued the Plaintiff a "Right to Sue" letter.


## VI.    First Cause of Action: Discrimination and Harassment in Violation of Section 1981

113.    Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 112,

inclusive, as if fully set forth herein.

114.    Defendants have discriminated against the Plaintiff on the basis of her race/color

(African-American) in violation of Section 1981, by denying her the same terms and

conditions of employment available to employees who are not African-American,

including, but not limited to, subjecting her to disparate working conditions, and

denying her the opportunity to work in an employment setting free of unlawful

harassment.

115.    Defendants have discriminated against Plaintiff on the basis of her race/color in

violation of Section 1981 by creating, fostering, accepting, ratifying and/or otherwise

---

[5] *See* MDACC WEBSITE, at https://www.MDACC.edu/gsbs/gsbs-home/diversity-equity-and-inclusion/diversity-statement.

failing to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiff because of her race/color.

116. Defendants have discriminated against the Plaintiff on the basis of her race/color (African American) in violation of Section 1981 by their barrage of stereotypical and demeaning text messaging images, including open discussions about her lips, hair, voice, and make-up.

117. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continue to suffer, severe mental anguish and draining emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

118. Defendants' unlawful and discriminatory conduct in violation of Section 1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

## VII.   Second Cause of Action: Retaliation in Violation of Section 1981

119. Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 118, inclusive, as if fully set forth herein.

120. Defendants have retaliated against the Plaintiff in violation of Section 1981 for opposing and/or complaining of Defendant's discriminatory practices against herself

by, *inter alia*, subjecting Plaintiff to acts of discrimination, harassment, and humiliation, subjecting her to dehumanizing and sophomoric working conditions.

121.   As a direct and proximate result of Defendant's unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continue to suffer, severe mental anguish and draining emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

122.   Defendants' unlawful and retaliatory conduct in violation of Section 1981 was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

## VIII.   Third Cause of Action: Discrimination and Harassment in Violation of Title VII

123.   Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 122, inclusive, as if fully set forth herein.

124.   Defendants have discriminated against Plaintiff on the basis of her race/color (African-American) and/or national origin, in violation of Title VII, by denying her the same terms and conditions of employment available to employees who are not African-American, including, but not limited to, subjecting her to disparate working conditions and denying her the opportunity to work in a normal working employment environment and one that is free of unlawful harassment.

125.    Defendants have discriminated against Plaintiff on the basis of her race/color and/or national origin in violation of Title VII by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, *inter alia*, severe and pervasive harassment of Plaintiff because of her race/color and/or national origin.

126.    Defendants have discriminated against Plaintiff on the basis of her race/color and/or national origin in violation of Title VII by bombarding her with bigoted tropes and stereotypes that dehumanize Black people.

127.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continue to suffer, severe mental anguish and exhausting emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

128.    Defendants' unlawful and discriminatory conduct in violation of Title VII was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

IX.     **Fourth Cause of Action: Race and Color Discrimination in Violation of the Texas Labor Code**

129.    Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 128, inclusive, as if fully set forth herein.

130.    Defendants have discriminated against Plaintiff on the basis of her race/color (African-American) and/or national origin, in violation of Chapter 21 of the Texas Labor Code, by denying her the same terms and conditions of employment available to employees who are not African-American, including, but not limited to, subjecting her to disparate working conditions and denying her the opportunity to work in a normal working employment environment and one that is free of unlawful harassment.

131.    Defendants have discriminated against Plaintiff on the basis of her race/color and/or national origin in violation of Chapter 21 of the Texas Labor Code by creating, fostering, accepting, ratifying and/or otherwise failing to prevent or to remedy a hostile work environment that included, *inter ali*a, severe and pervasive harassment of Plaintiff because of her race/color and/or national origin.

132.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Chapter 21 of the Texas Labor Code, Plaintiff has suffered, and continue to suffer, severe mental anguish and exhausting emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, emotional pain and suffering, as well as physical injury, for which she is entitled to an award of monetary damages and other relief.

133.   Defendants' unlawful and discriminatory conduct in violation of Chapter 21 of the Texas Labor Code was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive (exemplary) damages.

## X.   Fifth Cause of Action: Negligent Hiring, Retention, and Supervision

134.   Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 133, inclusive, as if fully set forth herein.

135.   Defendant M.D. Anderson violated its duty as Plaintiff's employer to provide a safe workplace, to take reasonable steps to determine the fitness of Plaintiff's co-workers and supervisors, and to reasonably supervise Plaintiff's co-workers and supervisors by, *inter alia*, failing and refusing to investigate and/or take appropriate disciplinary or other action in response to Plaintiff's verbal and written complaints of discriminatory and harassing conduct by her co-workers and/or supervisors on the basis of her race/color and her national origin, thereby permitting to continue and condoning such insulting, degrading, bigoted conduct.

136.   Defendant M.D. Anderson had actual knowledge of the undue risk of harm to which it was thereby exposing Plaintiff based on Plaintiff's multiple written and verbal complaints to her supervisors, Human Resources, Internal Investigations, and other officials at the facility.

137.   As a direct and proximate result of Defendant M.D. Anderson 's breach of duty to supervise, Plaintiff has been injured and has incurred damages thereby.

## XI.   Sixth Cause of Action: Intentional Infliction of Emotional Distress

138.   Plaintiff hereby re-alleges each and every allegation in paragraphs 1 through 137, inclusive, as if fully set forth herein.

139.   Defendant intentionally or recklessly, by the actions described herein, caused the Plaintiff severe emotional distress, which continues.

140.   Defendant's conduct was extreme and outrageous and proximately caused Plaintiff severe emotional distress.

141.   Plaintiff suffered damages for which Plaintiff herein sues.

## XII.   Claim for Legal Fees and Expenses

142.   Should she prevail, as expected, in this employment discrimination lawsuit, the Plaintiff is entitled to an award of her legal fees and expenses, pursuant to 42 U.S.C. §2000e-5 (k).

143.   Should she prevail, as expected, in this employment discrimination lawsuit, the Plaintiff is also entitled to an award of her legal fees and expenses, pursuant to §21.259 of the Texas Labor Code.

144.   The Plaintiff respectfully claims for reimbursement of the entirety of her legal fees and expenses, before, during, and following the present suit.

**PRAYER FOR RELIEF**

WHEREFORE, your Plaintiff, Ms. Jazzalynn McMurrin respectfully prays that the honorable Court enter judgment in her favor and against each Defendants, containing the following relief:

a)    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the laws of the State of Texas;

b)    An injunction and Order permanently restraining Defendants from engaging in such unlawful conduct;

c)    An order directing Defendant M.D. Anderson to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and harassing treatment and otherwise unlawful conduct, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect her employment, career, and personal life.

d)    An award of damages in an amount to be determined at trial, of at least one hundred and fifty thousand dollars, plus pre-judgment and post-judgment interest, to compensate Plaintiff for all of her monetary and/or economic harm.

e)    An award of damages in an amount to be determined at trial, plus pre-judgment and post-judgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment.

f)      An award of damages in an amount to be determined at trial, plus pre-judgment

and post-judgment interest, to compensate Plaintiff for all of her non-monetary

and/or compensatory harm, including, but not limited to, compensation for her

mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain

and suffering, emotional distress, and physical injuries.

g)      An award of damages for any and all other monetary and/or non-monetary losses

suffered by Plaintiff in an amount to be determined at trial, plus pre-judgment and

post-judgment interest.

h)      An award of punitive (exemplary) damages;

i)      An award of costs that Plaintiff has incurred in this action; and

j)      An award of the Plaintiff's reasonable attorneys' fees and expenses to the fullest

extent permitted by law.


Plaintiff Jazzalynn McMurrin further prays for such other and further relief to which she

might be entitled, or which this honorable Court may deem just and proper, whether in law or in

equity, and whether under the Constitution, statutes, Rules, regulations, and common law of the

United States, or the Constitution, statutes, and common law of the State of Texas.

## JURY DEMAND

Your Plaintiff hereby respectfully demands a trial by jury on all issues of fact and damages stated herein.

Dated: Magnolia, Montgomery County, Texas

June 1, 2022

Respectfully submitted,

ROBERT TEIR, PLLC

_____

Robert Teir
State Bar of Texas No. 00797940
35835 FM 1774
Magnolia, Texas 77362
EM rob@teirlaw.com
PH 832,.365.1191
FX: 832.550.2700

Attorneys for Plaintiff
Ms. Jazzalynn McMurrin

*McMurrin v. M.D. Anderson Cancer Services*
PLAINTIFF'S ORIGINAL COMPLIANT FOR EMPLOYMENT DISCRIMINATION
Page 33 of 33